USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/19/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

STEVEN HOLTZ, ISRAEL PELLOT, AND ALTON SCOTT,

Defendants.

25-cr-580 (MKV)

MEMORANDUM AND ORDER DENYING PRETRIAL MOTIONS FOR BILL OF PARTICULARS, SEVERANCE, TO SUPPRESS, AND TO ORDER DISCOVERY

MARY KAY VYSKOCIL, United States District Judge:

In December 2025, a grand jury returned an indictment charging Defendants Steven Holtz, Israel Pellot, and Alton Scott each with one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. [ECF No. 2 (the "Indictment")]. The Indictment also charges fifty-two individual counts of aiding and assisting in the preparation of false and fraudulent individual income tax returns in violation of 26 U.S.C. § 7206(2). Of those fifty-two counts, thirty charge Holtz (Counts Two through Thirty-One), nine charge Pellot (Counts Thirty-Two through Forty), and thirteen charge Scott (Counts Forty-One through Fifty-Three).

Holtz, on behalf of all Defendants, moves this Court to direct the Government to produce a bill of particulars concerning specific information and for the Government to produce all exculpatory information it possesses. [ECF No. 73]. In support, he has filed a memorandum of law ("Holtz Mem.") [ECF No. 74], and a declaration of Paul Weinstein, Esq. ("Weinstein Decl."). [ECF No. 75]. Pellot separately moves to sever his trial from Holtz's trial, [ECF No. 71], and has filed a memorandum of law in support ("Pellot Mem."). [ECF No. 72]. Scott also moves to sever his trial from Holtz's trial and to suppress certain evidence seized pursuant to a warrant authorizing a search of his electronic devices. [ECF No. 67]. In support, he has filed a memorandum of law ("Scott Mem."), as well as an affidavit ("Scott Aff."), [ECF No. 68], and declaration of Deborah

Colson, Esq. ("Colson Decl.") [ECF No. 69]. Pellot and Scott do not seek severance from each other but rather solely seek severance from Holtz.

The Government has filed a single opposition to all of the motions ("Opp'n"). [ECF No. 78]. Each Defendant has filed a separate reply. [ECF No. 80 ("Pellot Reply"); ECF No. 81 ("Scott Reply"); ECF No. 82 ("Holtz Reply")].

For the reasons stated herein, the motions are denied.

## BACKGROUND[1]

The Indictment in this case alleges a decade-long tax fraud conspiracy operated by Defendants through The Holtz Group, Inc. and Zirin Tax Company, Inc. (collectively, the "Holtz Group"). Indictment ¶¶ 1-2, 4. Defendant Holtz was the owner and CEO of the Holtz Group, which prepared and filed annual tax returns for its clients. Indictment ¶ 1.a. Defendant Pellot was employed as a tax preparer by the Holtz Group, which he joined in or about 1997. Indictment ¶ 1.b.[2] Defendant Scott joined the Holtz Group as a data entry assistant to Pellot in 2017 and then was employed as a tax preparer beginning in 2018. Indictment ¶ 1.c.

Count One of the Indictment alleges that from 2014 until 2025, Defendants and other unnamed co-conspirators conspired to defraud the United States by filing false information on the federal income tax returns of clients of the Holtz Group to fraudulently reduce their client's tax liabilities and increase their refunds. Indictment ¶¶ 2-8. The detailed Indictment explains the various tax forms the Holtz Group filed on behalf of its clients and the process by which Defendants prepared their clients' tax returns. Indictment ¶¶ 3, 4.a. In addition, the Indictment

[1] The factual background is derived largely from the Indictment, and from declarations submitted by Defendants in connection with their motions, and the parties' briefing.

[2] In his Reply, Pellot states that he "left the company from 1999 to 2012, when he returned to work there as an independent contractor." Pellot Reply at 2 n.1.

alleges the type of entries on the tax returns Defendants allegedly falsified in order to effectuate their scheme. Specifically, the Indictment alleges, among other things, that Defendants claimed fictitious or inflated deductions, "including but not limited to: itemized deductions, such as charitable contributions and unreimbursed employee expenses; business expense deductions; capital losses, such as deductions for bad debt; losses and expenses from rental real estate businesses and unreimbursed partnership expenses; casualty and theft losses; losses from sales of business property; and losses from sales and other dispositions of capital assets." Indictment ¶¶ 4.b-c. The Indictment also alleges that Defendants falsified clients' incomes to qualify for refundable earned income tax credits and fraudulently elected "head of household" filing status for clients who did not qualify to take advantage of lower tax rates. Indictment ¶¶ 4.d-e. According to the Indictment, Holtz trained other tax preparers, including Pellot and Scott, on how to falsify clients' returns. Indictment ¶ 4.f. Further, the Indictment alleges that Holtz instructed Pellot, Soctt and others to urge clients to set up certain business entities so that the tax preparers could then fraudulently claim further tax deductions for these entities for expenses such as meals, travel, and gifts. Indictment ¶ 4.g. The Indictment alleges at least one overt act that each Defendant took in furtherance of the conspiracy. Indictment ¶¶ 8a.-d. (alleging each Defendant filed a Form 1040 on behalf of a client of the Holtz Group that was known to contain false information).

In addition to the charged conspiracy, Counts Two through Fifty-Three of the Indictment allege substantive counts of tax fraud in violation of 26 U.S.C. § 7206(2) (the "7206(2) Counts" or the "substantive tax fraud counts"). Each 7206(2) Count identifies a specific tax return prepared by either Holtz, Pellot, or Scott for a particular client or clients for a particular year. Indictment ¶¶ 9-14. For each substantive tax fraud count, the Indictment alleges the specific line item of the corresponding tax return that is false. Indictment ¶¶ 9-14. For example, Count Two charges Holtz

with aiding and abetting in the preparation of false and fraudulent individual income tax returns for Client-1 & Client-2 for the 2019 tax year and identifies the particular lines of the return that are alleged to be false. Indictment ¶ 10 (specifying line 28E of Schedule E and lines 11 and 12 of Schedule A). In total, the fifty-two 7206(2) Counts—with each pertaining to a particular false tax return—identify twenty-five specific clients of the Holtz Group on whose behalf the allegedly false returns were prepared. Indictment ¶¶ 9-14. The references to specific clients in the Indictment are anonymized, but after the Indictment was unsealed, the Defendants were provided with a "client key" that identifies the identity of each client named in the Indictment. Opp'n at 13 n. 6.

## PROCEDURAL HISTORY

### I. Investigation and Prior Civil Litigation

In April 2023, the Holtz Group learned it was under criminal investigation by agents from the Internal Revenue Service ("IRS") after agents sent letters and subpoenas to several clients and at least one Holtz Group employee. Holtz Mem. at 5; Opp'n at 4. In February 2024, the IRS suspended the Holtz Group's e-filing authorization number, which allows tax preparers to file tax returns electronically. Opp'n at 4. In response, the Holtz group sued the IRS in the Eastern District of New York seeking a preliminary injunction of that suspension. *See Zirin Tax Co. v. IRS*, No. 24 Cv. 1511 (E.D.N.Y.). Ultimately, the motion for a preliminary injunction was denied and the case was dismissed. *See Zirin Tax Co., Inc. v. United States by & through Comm'r of Internal Revenue Serv.*, No. 24-cv-01511 (NCM) (MMH), 2025 WL 2932757 (E.D.N.Y. Oct. 15, 2025).

### II. Arrest of Scott

As the criminal investigation was ongoing, United States Magistrate Judge Ona T. Wang signed a criminal complaint on March 31, 2025 that charged Scott with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of aiding and assisting in

the preparation and presentation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2). [ECF No. 1]. The following day he was arrested while carrying three Apple iPhones and two laptops (the "Scott Devices"). Colson Decl. ¶ 5; Opp'n at 6.

On April 14, 2025, United States Magistrate Judge Sarah L. Cave signed a warrant authorizing the search and seizure of the Scott Devices. Colson Decl., Ex. C (the "Scott Devices Warrant"). The warrant was supported by an affidavit of IRS-CI Special Agent Wojtanowski. Colson Decl., Ex. B ("Warrant Affidavit" or "Warrant Aff.").

The Warrant Affidavit described three subject offenses. Warrant Aff. ¶ 6. Two mirrored the charges in the criminal complaint against Scott: conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and aiding and abetting the preparation and presentation of false and fraudulent tax returns in violation 26 U.S.C. § 7206(2). It also contained a third charge that was not present in the complaint: subscribing to false and fraudulent U.S. individual income tax returns in violation of 26 U.S.C. § 7206(1). The Warrant Affidavit addressed probable cause for the subject offenses in two parts. In the first subpart titled "SCOTT's Participation in the Tax Conspiracy at the Holtz Group," the Warrant Affidavit incorporated the allegations in the criminal complaint. Warrant Aff. ¶¶ 7-8. Scott concedes that this portion of the Warrant Affidavit established probable cause to support his participation in the tax fraud conspiracy at the Holtz Group. Scott Mem. at 11. The second subpart, titled "Additional Facts Pertaining to the Subject Offenses," focused on Scott's individual tax returns. Warrant Aff. ¶¶ 9-10. In that portion, Special Agent Wojtanowski stated that he had reviewed Scott's 2021 personal tax returns and the 2022 tax returns for his personal business (Scotts Consulting LLC) and concluded that they contained "many of the same potentially fraudulent deductions that existed on tax returns for customers of the Holtz Group." Warrant Aff. ¶ 9. The Warrant Affidavit then provided two examples of Scott

falsifying his own individual tax returns: (1) that Scott's personal tax return in 2021 claimed a $3,000 bad debt loss deduction;[3] and (2) that the 2022 tax return for Scotts Consulting LLC contained deductions for expenses for rent, travel, and insurance, among others, that were similar to falsified deductions claimed on behalf of Holtz Group clients. Warrant Aff. ¶¶ 9a.-b. Relying on the Warrant Affidavit, Magistrate Judge Cave issued a warrant to search the Scott Devices for evidence of the three subject offenses including "[e]vidence concerning Alton Scott's preparation of his own personal tax returns." Scott Devices Warrant at 4.

**III. Discovery**

Since the return of the Indictment, the Government has produced nearly 850,000 pages of materials, including memoranda, interview notes, tax records, financial records, subpoena returns, and correspondence. Weinstein Decl. ¶ 5. The Government last produced documents on June 9, 2026. Weinstein Decl. ¶ 4. The Government represents that pursuant to Federal Rule of Criminal Procedure 16 it has produced: (1) "copies of the relevant tax returns that are alleged to be false in counts two through fifty-three of the Indictment"; (2) "copies of multiple years of tax returns for approximately 145 additional customers of the Holtz Group which the Government did not specifically allege were false pursuant to 26 U.S.C. § 7206(2)"; (3) documents and communications the Government has received from clients of the Holtz Group; (4) recordings from an undercover law enforcement operation; and (5) documents received from employees from the Holtz Group and other third parties. Opp'n at 7. In addition, the Government states it has provided "more than 400 documents containing notes and/or memoranda of witness statements of more than 150 taxpayer customers of the Holtz Group" and "120 so-called 'Draft Revenue Agent

[3] Special agent Wojtanowski disclaimed "specific knowledge as to the falsity of this deduction" but noted that based on his investigation of the Holtz Group, clients of the Holtz Group routinely had false bad debt deductions on their tax returns. Warrant Aff. ¶ 9 n.2.

Reports' reflecting draft analyses by an IRS employee regarding the amount of tax loss to the Government resulting from the falsities included on certain of the tax returns." *Id.* The Government represents that it has turned over every single tax return in its possession. *Id.* at 40.

Each production has "been accompanied by cover letters identifying the Bates ranges where the Defendants can locate categories of documents" and is organized into appropriate folders to simplify Defendants' review process. *Id.* at 8.

## DISCUSSION

### I. A Bill of Particulars Is Not Warranted

Under the Federal Rules of Criminal Procedure, a court may "direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). The purpose of a bill of particulars is to provide a defendant with sufficient information concerning the charges against him in order to prepare for trial, avoid prejudicial surprise, and to interpose a plea of double jeopardy should he be prosecuted again for the same offense. *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 327 (S.D.N.Y. 2024); *United States v. Griffith*, 515 F. Supp. 3d 106, 121 (S.D.N.Y. 2021). Whether to grant a bill of particulars is committed to the sound discretion of the district court. *Torres*, 901 F.2d at 234; *Shvartsman*, 722 F. Supp. 3d at 328.

"A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)); *see also United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016). A bill of particulars is not warranted where the information sought "is provided in the indictment or in some

acceptable alternate form" such as discovery. *United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998) (quoting *Bortnosvky*, 820 F.2d at 574); *see also United States v. Morgan*, 690 F. Supp. 2d 274, 284 (S.D.N.Y. 2010). Ultimately, a bill of particulars should not be employed as a discovery device and the appropriate inquiry in deciding a motion for a bill of particulars is whether the information sought is necessary, not merely helpful. *See Torres*, 901 F.2d at 234; *United States v. Guan*, No. 24-cr-322 (VM), 2026 WL 160995, at *3 (S.D.N.Y. Jan. 21, 2026); *United States v. Kogan*, 283 F. Supp. 3d 127, 132 (S.D.N.Y. 2017).

### *A. The Government Need Not Identify The Entire Universe of False or Fraudulent Tax Returns*

Defendants argue that the Government must provide a bill of particulars that identifies the "entire universe of tax returns it claims were false of misleading." Holtz Mem. at 8-9. Specifically, Defendants argue that while the 7206(2) Counts—*i.e.*, counts Two through Fifty-Three of the Indictment—specify fifty-two returns that the Government alleges are false, the Government has produced multiple years of tax returns for at least 145 additional clients but has failed to specify whether it believes any of those additional tax returns are false and will attempt to introduce them at trial. Holtz Mem. at 8-9; Holtz Reply at 4-7 ("The issue is much narrower: the Government's refusal to advise whether it will attempt to introduce evidence at trial of any of those many, many other returns" that it has not specifically alleged to be false).

The Government counters that Defendants are improperly requesting that the Government produce its trial exhibit list now and that the detailed "speaking" Indictment and substantial discovery is more than sufficient to put Defendants on adequate notice of the charged conduct. Opp'n at 11-16. Specifically, the Government argues, Opp'n at 12, that the Indictment, among other things, identifies numerous types of fraudulent income deductions utilized by Defendants to effectuate the scheme as well as two ways in which Defendants fraudulently reduced their client's

tax liability by claiming false earned income tax credits and "head of household" filing status. *See* Indictment ¶ 4. Further, the Indictment identifies specific overt acts each Defendant took in furtherance of the conspiracy—namely a specifically identified false tax return each Defendant filed on behalf of a client. Indictment ¶ 8. The Government also notes that it has produced all the tax returns in its possession, which includes the tax returns for 145 Holtz Group clients that the Government did not include in the substantive 7206(2) Counts, along with notes and memorandum from interviews with more than 150 clients. Opp'n at 13-14. To the extent a client has informed the Government that there are inaccuracies in its returns, the Government represents that it has disclosed those allegations to Defendants. *Id.* In turn, the Government argues Defendants can review the relevant tax return and determine for themselves whether it is false. *Id.* Accordingly, the Government argues that Defendants have all the necessary information in their possession to identify which tax returns that Government may seek to introduce at trial and claim are false. *Id.*

As a general matter, "[t]he Government need not, when charging a conspiracy, set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy." *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir. 1975). Indeed, "courts routinely deny motions for bills of particulars that request particular wheres, whens, and with whoms which can be determined from the complaint, the indictment, or by reading even voluminous discovery." *United States v. Lemay*, No. 21-cr-573 (MKV), 2022 WL 1498961, at *3 (S.D.N.Y. May 12, 2022) ("*Lemay I*"); *see also United States v. Shulaya*, No. 17-cr-0350 (KBF), 2017 WL 6513690, at *9 (S.D.N.Y. Dec. 20, 2017); *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) ("[D]isclosure of all the overt acts in furtherance of the conspiracy . . . is not properly the function of a bill of particulars.").

Nonetheless, as Defendants point out, in cases involving significant fraud, courts have

granted motions for bills of particulars that specify "which document or transactions it intends to prove are fraudulent if this information is not ascertainable." *United States v. Vaid*, No. 16-cr-763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017); *United States v. Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009) (describing the "needle in a haystack problem" where courts have granted motions for a bill of particulars where defendants are "faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent"). Courts do so because holding otherwise risks a distinct possibility that the burden of proof is impermissibly shifted to a defendant to prove certain documents are not fraudulent. *Bortnovsky*, 820 F.2d at 574-75 (finding district court abused its discretion in denying motion for bill of particulars and concluding "[t]he Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged"); *see also United States v. Nachamie*, 91 F .Supp. 2d 565, 571, 574 (S.D.N.Y. 2000) (granting bill of particulars in Medicare fraud prosecution that required Government to identify which of "2,000 Medicare claims" were allegedly fraudulent and submitted as part of the conspiracy); *United States v. Tabi*, No. 05 CR. 471(LMM), 2007 WL 582731, at *7 (S.D.N.Y. Feb. 23, 2007) (granting bill of particulars requiring government to "identify with specificity all tax returns prepared and/or filed by defendant which are alleged to be false" and noting Government has charged defendant with filing "at least 550" false returns and "it is not at all unfair for the defendant to require a specification of them").

While the Government has produced the tax returns for 145 additional Holtz Group clients not specified in the Indictment without specifying which among them it may claim is false, it cannot be said that this "information is not ascertainable" for Defendants considering the detailed

Indictment and significant discovery in this case. *See Vaid*, 2017 WL 3891695, at *11. Indeed, as the Government avers, it has produced notes and memoranda of interviews of more than 130 of these clients. Opp'n at 13. Thus, Defendants do not face a "needle in a haystack problem" but rather can review the additional tax returns as well as the specific interview notes to determine for itself whether the Government may claim at trial that they are fraudulent. *See Lemay I*, 2022 WL 1498961, at *3 ("The Government has provided further information relevant to the Defendants' requests in its discovery disclosures, further obviating the need for a bill of particulars.").

The parties' briefing focuses in part on this Court's decision in *Lemay I*, as the Government analogizes the facts to that case, Opp'n at 11-12, 15-16, and Defendants seek to distinguish it. Holtz Reply at 6. Contrary to Defendants' protestations, the circumstances of this case are more akin to those in *Lemay I*. As in *Lemay I*, the detailed speaking Indictment in this case identifies certain overt acts taken by Defendants in connection with the alleged conspiracy and "provide[s] the framework for the Government's theory against" Defendants. *Lemay I*, 2022 WL 1498961, at *3-4. The Indictment here provides numerous specific examples of the type of falsified entries that were present on the tax returns of Holtz Group Clients, which provides further guidance as to which documents the Government may allege are false. *Cf. Bortnovsky*, 820 F.2d at 575 (noting simply providing mountains of documents is not proper where defendants are left "unguided" as to which documents are false). Moreover, as in *Lemay I*, the Government here has provided significant discovery relevant to Defendants' request that is organized by categories with subfolders and accompanied with cover letters identifying the Bates ranges and where Defendants can locate categories of documents, "further obviating the need for a bill of particulars." *Lemay*, 2022 WL 1498961, at *3-4.

In short, while Defendants reasonably would like to have this level of detail laid out for

them, it is not necessary for their defense given that the Indictment and discovery to date provide more than sufficient notice of the charges pending against Defendants. *See Walsh*, 194 F.3d at 47; *Kogan*, 283 F. Supp. 3d at 132 (bill of particulars only required where the "the information sought is necessary" not merely "helpful"); *Bonventre*, 646 F. App'x at 79. Further, the request is an improper attempt to preview the Government's proof at trial. *United States v. Kostin*, No. 24-CR-91 (GHW), 2025 WL 1504409, at *31 (S.D.N.Y. May 27, 2025) (denying motion for bill of particulars that amounted to a request for "a preview of the Government's proof at trial, which is not the proper purpose for a bill of particulars"); *Griffith*, 515 F. Supp. 3d at 122 (a bill of particulars generally should not serve as a "a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial") (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)). While there are possibly tax returns the Government has not specifically identified as false or fraudulent, that concern should not be addressed through a bill of particulars, but rather through ensuring defense has sufficient time in advance of trial to review all the relevant discovery to ascertain which other tax returns the Government has produced may include false information. *See Torres*, 901 F.2d at 234; *Lemay I*, 2022 WL 1498961, a *5.

***B. The Government Need Not Identify The Specific Entries It Contends To Be False***

In addition to seeking a further specification of the tax returns the Government asserts are false, Defendants demand that the Government "identify what specifically it contends was false about each return." Holtz Mem. at 10; Holtz Reply at 7-9. In their opening brief, Defendants sought greater specificity regarding certain of the fifty-two returns that underlie the 7206(2) Counts as well as any other unidentified tax return the Government may assert is false. Holtz Mem. at 10. However, in their reply, Defendants abandon the request for greater specificity as to the fifty-two

identified tax returns conceding that they can determine what is false in those documents based on discovery, namely client interviews, that the government has produced. Holtz Reply at 7. Thus, Defendants now only seek specification of which entries are alleged to be false in the unidentified universe of other tax returns the Government may claim are fraudulent at trial separate from the fifty-two identified tax returns.

For much the same reason as above, the Court concludes that this level of particularization is not necessary and is not an appropriate use of a bill of particulars given the detailed Indictment in this case and the voluminous discovery provided to date. Specifically, and as discussed, the Indictment describes the conspiracy in which Defendants allegedly were engaged, Indictment ¶¶ 3-4, and identifies specific types of entries that Defendants falsified in preparing tax returns on behalf of their clients. Indictment ¶¶ 4.b-c. For example, the Indictment alleges Defendants included inflated or falsified deductions for all sorts of itemized deductions including "charitable contributions and unreimbursed employee expenses" among several others. Further, it alleges that Defendants falsified income to claim the earned income tax credit or falsely elected head of household filing status for clients who did not qualify. Indictment ¶¶ 4.d-e. In addition to this level of detail, the Government has produced notes and memoranda of witness interviews for more than 130 Holtz Group clients concerning tax returns that are not specifically alleged to be false in the substantive 7206(2) Counts. Opp'n at 13. In addition, where a client has informed the Government there are inaccuracies in its tax forms, the Government has "made extensive efforts to disclose such allegations to the Defendants." Opp'n at 13-14. Thus, for the additional tax returns not specifically charged as fraudulent in the 7206(2) Counts, Defendants can rely on these produced notes and memoranda, as well as the detailed Indictment, to identify potential falsities in the universe of tax returns the Government has produced to date. In short, "although it may

indeed aid [Defendants'] trial preparation if the government were to identify the specific falsehoods in" the additional tax returns, this would amount to an impermissible "preview" of the Government's case and is "not necessary" for their defense. *United States v. Feng Ling Liu*, No. 12-cr-934 (RA), 2014 WL 101672, at *14 (S.D.N.Y. Jan. 10, 2014) (denying motion for bill of particulars that sought "to identify the falsehoods" in asylum applications that the Government contends are fraudulent in some respects where the Indictment generally "identifies particular aspects of asylum applications that her firm is alleged to have falsified" and provides examples); *see also Bonventre*, 646 F. App'x at 79 (denying bill of particulars seeking "particulars as to the records alleged to be false, why they were false, and how [defendant] knew of their falsity" given such "evidentiary detail is not the function of the bill of particulars") (quoting *Torres*, 901 F.2d at 234); *Kahale*, 789 F. Supp. 2d at 376-77 ("[D]efendants are not entitled to a bill of particulars identifying the particulars of the false representations" where "the Indictment, discovery, and supplemental government disclosures have provided ample notice to defendants of the crimes charged" and the defendants possessed the documents containing the alleged lies "for many months"); *Jimenez*, 824 F. Supp. at 363 (government "may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories").

Defendants principally rely on *United States v. Frankel*, No. 22-cr-0180 (JS), 2023 WL 7091917 (E.D.N.Y. Oct. 26, 2023) and *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), in arguing that they are entitled to know in what way each tax return is false. Holtz Mem. at 10; Holtz Reply at 7. In both cases, the district court granted a bill of particulars directing the Government to specify how an identified claim was false or fraudulent. *Nachamie*, 91 F. Supp.

2d at 574 (ordering for each false or misleading Medicare claim the Government intends to prove at trial, the Government must specify "the manner in which such item or entry is allegedly false"); *Frankel*, 2023 WL 709197, at *6 (relying on *Nachamie* and holding that "[a]lthough the Government has provided Defendant sufficient notice of *which* claims were alleged to be fraudulent, [] it has not provided Defendant with sufficient notice concerning *how* those claims are fraudulent.") (emphasis in original). However, those cases are inapposite given that here, the detailed Indictment and substantial discovery produced more than permits Defendants to determine how each tax return is false. Moreover, unlike in *Nachamie*, which concerned 2,000 Medicare claims, Defendants here are confronted with the tax returns of around 145 additional clients—and they have notes from witness interviews from at least 130 of those clients. *See Feng Ling Liu*, 2014 WL 101672, at *14 (distinguishing *Nachamie* on the basis that "defendants are confronted with significantly fewer documents, namely 432 asylum applications, each of which the government has alleged is fraudulent in some way, although it has not specified which aspects of each application are false").

Accordingly, a bill of particulars disclosing in what way each tax return is false is not necessary given Defendants have been appraised of the charges against them in adequate detail.

### *C. The Government Need Not Identify The Unnamed Co-Conspirators, Principals, or Aiders and Abettors*

Defendants also argue that the Government must disclose the identities of the un-named "co-conspirators for Count One" and the un-named "principals or aiders and abettors for Counts Two through Fifty-Three." Holtz Mem. at 11 (requesting that the Government "disclose whether these other individuals were identified as co-conspirators, principals, and aiders and abettors—or not identified at all—before the Grand Jury that returned the Indictment"). Defendants contend that they "have no idea whether the Government considers any or all of the twenty-five clients

identified in the Indictment as having been complicit in the alleged offenses," nor "any information whether the Government believes or has any evidence that any of the Holtz Group's many employees played any role" in the charged scheme. Holtz Mem. at 12. Notably, after the filing of the Defendants' motion, the Government disclosed the identity of one co-conspirator—a former tax preparer at the Holtz Group that the Government intends to call as a cooperating witness at trial. Opp'n at 20 & n.8.

In evaluating requests for the identities of unnamed co-conspirators, courts consider the following factors: "(i) the number of co-conspirators; (ii) the duration and breadth of the alleged conspiracy; (iii) whether the Government has otherwise provided adequate notice of the particulars; (iv) the volume of pre-trial discovery; and (vi) the potential harm to the Government investigation." *Lemay I*, 2022 WL 1498961, at *5; *see also United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015) (collecting cases). Nonetheless, "courts in this circuit frequently exercise their discretion to deny requests to identify co-conspirators through a bill of particulars." *United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016). That outcome is particularly appropriate where, as here, "the allegations in the indictment are specific and the Government has provided discovery that will enable a defendant to adequately prepare his defense." *Id.*; *see also United States v. Adams*, No. 24 CR. 556 (DEH), 2025 WL 384558, at *6 (S.D.N.Y. Feb. 4, 2025); *United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361, at *17 (S.D.N.Y. Dec. 6, 2019); *United States v. Mahaffy*, 336 F. Supp. 2d 115, 120 (E.D.N.Y 2006).

Here, Defendants have not shown that disclosure of the identifies of un-named co-conspirators, principals, or aiders and abettors, is necessary to their defense. Again, the parties dispute the applicability of this Court's reasoning in *Lemay I* to the facts here. In *Lemay I*, this Court denied the defendants' request to identify co-conspirators where the tax fraud conspiracy

spanned six years and discovery included nearly one million records. *Lemay I*, 2022 WL 1498961, at *4-5. The Court reasoned that, at bottom, the case was "a relatively straightforward tax evasion conspiracy relating to one company" and that the discovery produced enabled counsel to adequately prepare a defense. *Id.* at *5. Similarly, while the charged conspiracy here allegedly spanned eleven years and discovery in this case has produced over 850,000 documents, at bottom "it is a relatively straightforward tax evasion conspiracy relating to one company"—the Holtz Group. *Id.* Moreover, discovery produced in this case, as discussed, is more than sufficient to permit the defense to adequately prepare for trial. The Government has produced its notes and memorandum of interviews of over 150 clients of the Holtz Group. Opp'n at 13, 20. The Government has also identified one Holtz Group employee that it alleges conspired with Defendants. The Government further asserts that "[t]o the extent the Government has interviewed Holtz Group employees and has notes and/or memoranda of their witness statements, the Government intends to produce those statements in advance of trial." Opp'n at 20 n.9.

Accordingly, under these circumstances it is not necessary here for the Government to reveal the identities of known co-conspirators, principals, and aiders and abettors. *See Torres*, 901 F.2d at 234 (affirming denial of bill of particulars seeking identities of known and unknown co-conspirators as an improper attempt at pre-trial discovery where the indictment "adequately advises defendants of the specific acts of which they are accused" and "defendants have been provided with a wealth of evidentiary detail from the discovery to date"); *Adams*, 2025 WL 384558, at *6 (denying bill of particulars seeking identifies of all alleged co-conspirators where indictment was specific and detailed and "the discovery produced by the Government is extensive and well organized"); *see also United States v. Wey*, No. 15-cr-611 (AJN), 2017 WL 237651, at *20 (S.D.N.Y. Jan. 18, 2017) (demands for information regarding "with whom the Government

will charge the defendant with conspiring are routinely denied" and collecting cases) (citation omitted); *United States v. Glisson*, No. 03-cr-148 (DAB), 2003 WL 21709502 at *3 (S.D.N.Y. 2003) ("denying bill of particulars seeking names of all co-conspirators and aiders and/or abettors in light of routine denial of such requests in case law and the sufficiency of information contained in the indictment and obtained through discovery."). Notwithstanding this ruling, the Court reminds the Government that it must provide the notes and/or memoranda of its interviews with Holtz Group employees sufficiently in advance of trial so that Defendants can adequately review that material and appropriately prepare their defenses.

In sum, the speaking Indictment, voluminous discovery and supplemental disclosures, including interview notes and IRS analyses, have provided Defendants with ample notice of the crimes charged. Defendants have had many months to review and analyze these materials to prepare their defense. Accordingly, Defendants' motion for a bill of particulars is denied.

## II. Motion for Severance

Pellot and Scott each separately argue that their trials should be severed from the trial of their co-defendant Holtz. As noted, Pellot and Scott do not seek severance from each other. For the reasons set forth below, the motions to sever are denied.

Federal Rule of Criminal Procedure 14 provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The Supreme Court has made clear that there is a "preference" for joint trials for defendants indicted together and that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent

the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 537, 539 (1993).

The preference for a joint trial is "particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998). And where, as here, a defendant is charged as a member of a conspiracy "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Id.* at 111. Further, different degrees of culpability and proof "are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003); *see also United States v. O'Connor*, 650 F.3d 839, 858-59 (2d Cir. 2011) (noting that severance is not required simply because "evidence may be admissible against one defendant but not another") (citation omitted). Indeed, a limiting instruction can adequately reduce the risk of prejudice where evidence is irrelevant to one defendant in a multi-defendant trial. *See United States v. Bennett*, 485 F. Supp. 2d 508, 515 (S.D.N.Y. 2007).

Pellot and Scott argue that severance is warranted given the high risk of spillover prejudice—*i.e.*, that there will be considerably more evidence offered against Holtz and the jury might improperly associate all the evidence against Holtz as evidence against them. Pellot Mem. at 5; Scott Mem. at 15 -16. Pellot and Scott point out that Holtz is charged in thirty separate counts of aiding and abetting in the preparation of fraudulent tax returns, covering seventeen separate clients and 119 false entries, whereas Scott is charged in only thirteen such counts covering nine clients and thirty-nine false entries, and Pellot is charged in nine such counts covering six clients and fifteen false entries. Pellot Mem. at 5; Scott Mem. at 15-16; *see also* Indictment ¶¶ 9-14. Relatedly, Pellot and Scott argue severance is warranted because much of the evidence against

Holtz would be inadmissible as to them. Specifically, Pellot argues that "Holtz's own preparation of allegedly false tax returns on behalf of his clients – with no involvement or knowledge on the part of Pellot – would not be relevant proof as to the existence of a conspiracy between Holtz and Pellot." Pellot Mem. at 5-6. For his part, Scott also argues that since he only joined the Holtz Group in 2018, evidence of Mr. Holtz's conduct before that time would be inadmissible as against him. Scott Mem. at 16.

These arguments do not warrant severance. The Court observes, in this connection, that if a co-defendant, such as Holtz, is shown to be more culpable, this could, in fact, inure to the benefit of the lesser involved defendant since the jury may well find that the relative lack of involvement is indicative of less or no culpability. In any event, the law is clear that severance is not automatic simply because there is a disparity in the degree of evidence and proof of culpability among co-defendants. *Spinelli*, 352 F.3d at 55 ("Even joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.") (internal quotation marks omitted); *Cardascia*, 951 F.2d at 483 ("[D]isparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance."); *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983) (same); *see also United States v. Lemay*, No. 21-cr-573 (MKV), 2022 WL 17363595, at *5 (S.D.N.Y. Dec. 1, 2022) ("*Lemay II*"). Moreover, in this case, the evidence as to each 7206(2) Count—*i.e.*, whether certain entries in a given client's tax return are false or fraudulent—appears straightforward for a jury to consider without significant spillover prejudice. *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) ("[T]he evidence with respect to each of the defendants was sufficiently straightforward that the jury could consider it without any significant spillover effect."). Moreover, the risk of spillover prejudice is further diminished where all defendants, as here, are

charged under the same conspiracy count. *See United States v. Blackshear*, 313 F. App'x 338, 342 (2d Cir. 2008) (noting severance is "rare in conspiracy cases where the government is entitled to show the entire range of evidence of the conspiracy against each [defendant] even where one [defendant's] role in the conspiracy may have been smaller or less central than that of certain other co-conspirators") (cleaned up); *Salameh*, 152 F.3d at 115 (risk of spillover prejudice "is an unlikely occurrence when all the defendants are charged under the same conspiracy count").

Further, with respect to the prejudicial risk of certain evidence concerning Holtz being introduced at a joint trial, the Government correctly argues that much of the evidence against Holtz, including his pre-2018 conduct, could be admissible in a joint trial as "relevant to proving the nature and scope of the conspiracy in which both [moving co-defendants] were, to differing degrees, involved." *Spinelli*, 352 F.3d at 56; *see also Salameh*, 152 F.3d at 111 ("[A]ll the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."). As for Scott's argument that conduct that predates his alleged involvement with the conspiracy would be inadmissible against him and thus mandates severance, Holtz's previous conduct could be relevant "to prov[e] the nature and scope of the conspiracy." *Spinelli*, 352 F.3d at 56; *see also United States v. Farhane*, 634 F.3d 127, 161 n.35 (2d Cir. 2011) ("Where statements are made in the course of an existing conspiracy in which the defendant later joins, those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made[.]"); *Lemay II*, 2022 WL 17363595, at *4. In any event, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *Spinelli*, 352 F.3d at 56.

Neither Pellot nor Scott have shown that the admission of evidence otherwise inadmissible as against them in a joint trial would result in substantial prejudice or that an appropriate limiting

instruction will be insufficient to ameliorate any potential prejudice. *See O'Connor*, 650 F.3d at 858 (2d Cir. 2011); *see also Rittweiger*, 524 F.3d at 179-80 (finding risk of spillover prejudice ameliorated where district court's limiting instruction explained "when evidence could not be considered against a particular defendant, and the jury charge carefully explained that the jurors must consider the case against each defendant separately"). The Second Circuit recognizes that there is a "strong presumption that juries follow limiting instructions." *United States v. Graham*, 51 F.4th 67, 83 (2d Cir. 2022) (citation omitted).

Scott's final argument that severance is warranted because he and Holtz have mutually antagonistic defenses is similarly unpersuasive. Scott Mem. at 17. Scott argues that his defense rests on the fact that he worked under Holtz's supervision and was not a knowing participant in the criminal conspiracy. Reply at 7-8. He argues that if the jury finds evidence of fraud, his defense will directly inculpate Holtz as his supervisor.[4] From there, Scott reasons that "if Mr. Holtz denied knowledge of the fraudulent returns or shifted responsibility onto his subordinates, his defense would be adverse to Mr. Scott's, leaving the jury to sort through two conflicting narratives." Scott Mem. at 17; *see also* Scott Reply at 8 ("The jury could not accept both that Mr. Scott acted under Mr. Holtz's direction and that he acted independently of Mr. Holtz.").

The case for severance is stronger when defendants in a joint trial will assert "mutually antagonistic defenses." *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003). A defense is mutually antagonistic only if "accepting one defense requires that 'the jury must of necessity convict a second defendant.'" *Id.* (quoting *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991)). However, mutually antagonistic defenses are not "prejudicial per se" and do not always

[4] Notwithstanding the nature of Scott's potential defense, Holtz has not moved for a severance, and it is not for Scott to complain of any prejudice to Holtz.

mandate severance. *Id.* Severance is not required, for instance, "where the risk of prejudice can be offset by less drastic measures . . . such as limiting instructions." *O'Connor*, 650 F.3d at 858 (2d Cir. 2011).

Scott's argument fails as he does not establish that his defense is mutually antagonistic to Holtz's. Scott's defense is mutually antagonistic from Holtz's defense only if acceptance of it "must of necessity" result in Holtz's conviction. *Cardascia*, 951 F.2d at 484. That standard is not met. As the Government explains, it is equally plausible that Holtz may put forward a defense of lack of intent—*i.e.*, that he supervised and instructed Scott properly—that does not conflict with the defense Scott proffers. Under this scenario, the jury could accept both defenses and conclude that both lacked the requisite intent. *See Lemay II*, 2022 WL 17363595, at *4 (noting that defense that co-defendant "directed" his activities was not mutually antagonistic because co-defendant may put forward a defense of lack of intent and "[i]n that scenario, the jury could, in theory, believe both defenses"); *see also Cardascia*, 951 F.2d at 485 (holding that "the essence of [the two co-defendants' defenses]—that each defendant was not involved in the conspiracy—plainly is typical of co-conspirator trials and does not warrant severance"). At bottom, Scott's argument merely reflects that both he and Holtz may seek to cast blame on the other. But severance is not warranted even where defendants "attempt to cast blame on each other" or engage in "fingerpointing." *United States v. Casamento*, 887 F.2d 1141, 1153-54 (2d Cir. 1989).

**III. Motion to Partially Suppress Scott Devices Warrant**

Scott separately seeks to partially suppress unspecified materials seized pursuant to a warrant on the basis of his own alleged tax fraud, or alternatively, that the Court hold a hearing

pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Scott Mem. at 1, 11-14; Scott Reply at 1.[5] In *Franks v. Delaware*, the Supreme Court held that, under certain circumstances, a Defendant may be entitled to an evidentiary hearing, a so-called *Franks* hearing, to collaterally attack the veracity of a warrant affidavit authorizing a search in the context of challenging the existence of probable cause. 438 U.S. at 171-72.

"The Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459, (2011)). Probable cause, however, "is not a high bar." *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (citation omitted). A search warrant issued by a neutral and detached magistrate is entitled to substantial deference and carries a "presumption of validity." *Franks*, 438 U.S. at 171; *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (doubts are to be resolved in favor of upholding the warrant); *Illinois v. Gates*, 462 U.S. 213, 236 (1983) ("A magistrate's determination of probable cause should be paid great deference by reviewing courts.") (citation omitted). A party arguing that a warrant was issued on less than probable cause faces "a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

While a defendant may challenge the truthfulness of a warrant affidavit and thereby undermine the basis for the search warrant, he must nonetheless meet the "demanding standard set forth in *Franks*." *United States v. Savage*, No. 25-cr-472 (CM), 2026 WL 1785996, at *1 (S.D.N.Y. June 22, 2026). To obtain a *Franks* hearing, a defendant "must make a substantial preliminary showing" that: (1) the affidavit contained an intentional and deliberate falsehood or

[5] Scott did not explicitly request a so-called *Franks* hearing in his opening brief but does so in his Reply. *Compare* Scott Mem. at 11-14 *with* Scott Reply at 1, 3.

statement made with reckless disregard for the truth; and (2) the allegedly false statement was necessary to the issuing judge's finding of probable cause. *Id.*; *see also United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003); *Franks*, 438 U.S. at 156, 171. Merely alleging that the affiant was negligent or made an innocent mistake is insufficient under the demanding *Franks* standard. *Franks*, 438 U.S. at 171; *see also United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) ("[M]isstatements or omissions caused by negligence or innocent mistake[s] do not warrant suppression") (citation omitted). Moreover, in assessing whether the false statement was necessary to a finding of probable cause, a court must "determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000).

Scott concedes that the Warrant Affidavit established probable cause that he participated in the tax fraud conspiracy at the Holtz Group. Scott Mem. at 11. He argues only that the specific portion of the Warrant Affidavit that alleges he falsified his own individual tax returns was not supported by probable cause because the two bases for that contention consisted of a material misstatement and rogue speculation. Scott Mem. at 11-14. Accordingly, he seeks to suppress any evidence uncovered concerning individual tax fraud. Scott Reply at 5. Significantly, Scott is not charged in the Indictment with individual tax fraud.

As previously noted, the two bases cited in the Warrant Affidavit for the contention that Scott falsified his own tax returns are: (1) Scott's personal tax return in 2021 claimed a $3,000 bad debt loss deduction; and (2) the 2022 tax return of Scotts Consulting LLC contained potentially fraudulent deductions for expenses for rent, travel, and insurance, among others. As to the first basis, Scott argues, and the Government concedes, that Scott did not actually claim a $3,000 bad debt loss deduction in 2021, but rather he claimed a $3,000 deduction for capital losses related to

his investments in ETrade and Robinhood Crypto. Scott Mem. at 5; Opp'n at 37 ("The Government acknowledges that it was incorrect to allege, as stated in the Warrant Affidavit," that Scott claimed a $3,000 deduction of a bad debt loss); *see also* Colson Decl., Ex. D ("2021 Scott Return") (reflecting that Scott claimed a capital loss of $3,000 on his 2021 tax return). As for the second basis, Scott argues the claim is devoid of any factual support because Special Agent Wojtanowski failed to investigate the falsity of the deductions and merely speculated they were false because similar false deductions were seen in the tax returns filed on behalf of Holtz Group clients. Scott Mem. at 5-6, 12.

As noted, the Government concedes that it was incorrect for the Warrant Affidavit to state that Scott claimed a $3,000 bad debt deduction on his 2021 tax return. Opp'n at 37. The Government appears to suggest that this was not a "bad faith" mistake since it would have been correct to say Scott carried forth bad debt deductions in 2019 and 2020. Opp'n at 34 n.2, 37. Of course, as Scott explains in his reply, the Warrant Affidavit did not concern bad debt losses in those years and as such this information, which was not in the Warrant Affidavit, is irrelevant. Accordingly, the Court concludes that Scott has made a substantial preliminary showing that the claim concerning the bad debt loss was made with "reckless disregard" for the truth given that a cursory review of Scott's 2021 tax return would have shown that Scott did not claim a bad debt loss for that year. *See* 2021 Scott Return; *see also Rajaratnam*, 719 F.3d at 154 ("Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.") (citation omitted).

In opposing the motion to suppress, the Government principally argues that even after excising the portion of the Warrant Affidavit wrongfully alleging a falsely claimed bad debt

deduction on Scott's 2021 tax return, there remains "sufficient probable cause to search the Scott Devices for evidence of Scott's personal tax evasion." Opp'n at 37. The Court agrees.

The Warrant Affidavit based probable cause that Scott included false deductions on his own tax returns on the allegation that his returns "contained many of the same potentially fraudulent deductions that existed on tax returns for customers of the Holtz Group." Warrant Aff. ¶ 9. It then provided two examples, only one of which was the bad debt deduction. The other example was the fact that the 2022 tax return for Scotts Consulting LLC contained various expenses, including "$36,000 in rent, $7,312 in business travel, $4,076 in insurance, $4,535 for 'legal and professional' services, $23,400 in other 'outside services,' $4,324 in office expenses, and $5,395 in business meals." Warrant Aff. ¶ 9.b. In turn, the Warrant Affidavit explained in detail that:

> Based on my review of documents provided by the Holtz Group and customers of the Holtz Group during the course of this investigation, as well as my interviews of over 100 customers of the Holtz Group, at least 20 of whom had their taxes prepared by SCOTT, and my communications with legal counsel for the Holtz Group, I understand that SCOTT was a full-time employee of the Holtz Group in 2022, and I am aware of little or no basis for the business expenses identified by SCOTT for Scotts Consulting LLC in 2022. In addition, many of these expenses – such as thousands of dollars in business meals and travel – are consistent with the types of deductions that have been identified on tax returns filed on behalf of customers of the Holtz Tax Group who, as explained in the Complaint, told the IRS that they did not provide the figures underlying these deductions to the Holtz Group. Therefore, there is probable cause to believe that in addition to aiding and abetting others in preparing false tax returns, SCOTT also prepared and subscribed to false tax returns on his own behalf.

Warrant Aff. ¶ 10.

As Special Agent Wojtanowski explains, he was "aware of little or no basis for the business expenses" claimed by Scotts Consulting LLC given Scott apparently worked full time at the Holtz Group, and that these expenses, which included thousands of dollars purportedly expended on business meals and travel, were unsupported to his knowledge and consistent with the false

"deductions that have been identified on tax returns filed on behalf of customers of the" Holtz Group. *Id.* These allegations, coupled with the detailed allegations concerning Scott's involvement in the tax fraud conspiracy and for filing false and fraudulent tax returns on behalf of his clients with similarly inflated deductions, is sufficient to meet the admittedly low bar for probable cause to support the search warrant for evidence of personal tax evasion by Scott and his consulting company. *See Wesby*, 583 U.S. at 57 (probable cause is "not a high bar"); *United States v. Menendez*, No. S2 23-cr-490 (SHS), 2024 WL 912210, at *3 (S.D.N.Y. Mar. 4, 2024) (probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience") (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004); *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (probable cause is a "fluid concept" and explaining that while it requires more than "mere suspicion," its "focus is on probabilities, not hard certainties") (citation modified); *United States v. Sosa*, 379 F. Supp. 3d 217, 220 (S.D.N.Y. 2019) (probable cause is "demonstrated where the totality of circumstances indicates a fair probability" that evidence of a crime will be found in a particular place) (citation omitted). Accordingly, Scott has not met his heavy burden to invalidate the search warrant issued by a neutral magistrate judge which carries a presumption of validity and is owed substantial deference. *Rivera*, 928 F.2d at 602 (noting courts should not invalidate warrants "by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner").

In sum, Scott has failed to make the substantial preliminary showing for a *Franks* hearing, let alone that the targeted portion of the warrant was not supported by probable cause even without the misstatement concerning the bad debt loss. Accordingly, his motion to partially suppress, or alternatively for a *Franks* hearing, is denied.

**IV. Demand for Disclosure of Exculpatory Material**

Defendants collectively move for the Court to direct the Government to produce evidence that falls within the ambit of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Holtz Mem. at 13; Holtz Reply at 11 (demanding *Brady* and *Giglio* material). Specifically, Defendants demand that the Government "produce any exculpatory materials concerning returns and taxpayers that undermine its theory of criminal liability" which includes identifying tax returns that are not false and statements by taxpayers that their returns are accurate. Holtz Mem. at 13. Defendants further demand evidence of "any employees of the Holtz Group who described a lack of criminal intent or expressed opinions or factual descriptions evincing a lack of criminality at the firm." Holtz Mem. at 13.

*Brady* and *Giglio* materials are materials "which, if not disclosed, creates a reasonable probability of altering the outcome" of trial. *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Such materials need only be disclosed "in time for its effective use at trial." *United States v. Gil*, 297 F.3d 93, 105 (2d Cir. 2002) (quoting *Coppa*, 267 F.3d at 142).

The Court notes that on January 14, 2026, the Court issued a written Order pursuant to Rule 5(f) of the Federal Rules of Criminal Procedure reminding the Government of its obligations under *Brady* and *Giglio*, [ECF No. 39], and the Court confirmed the Government's obligations on the same date at the first initial conference with the parties in this case. In its opposition, the Government acknowledges those obligations and pledges that it has complied with them and will continue to do so. Opp'n at 39-40. The Government also notes that it has produced all the tax returns in its possession and notes/memoranda of interviews with Holtz Group clients. Thus, to the extent these materials include exculpatory information, that information is already in Defendants' possession. Opp'n at 40. Further, the Government avers that it will produce witness

statements of any Holtz Group employees, even if they do not testify at trial, in advance of trial. Opp'n at 40.

In line with other district courts in this Circuit, the Court declines to demand immediate production of *Brady* or *Giglio* material in the face of the Government's pledge to provide such materials in a timely manner before trial. *See, e.g.*, *Murgio*, 209 F. Supp. 3d at 726 (collecting cases); *United States v. Lobo*, No. 15-cr-174 (LGS), 2017 WL 1102660, at *4 (S.D.N.Y. Mar. 22, 2017) (noting that "the practice in the Southern District of New York" is that the Government produce *Giglio* materials "a week or two before the start of trial, depending on the complexity of the case") (quoting *United States v. Espinal*, 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015)); *Feng Ling Liu*, 2014 WL 101672, at *16 (denying motion for disclosure of *Brady* and *Giglio* where Court assumed "that the government is aware of its disclosure obligations" and that "any exculpatory material will be disclosed promptly after discovery"); *United States v. Trippe*, 171 F. Supp. 2d 230, 237-38 ("In accordance with its traditional practice, the Court accepts the Government's affirmation that it will abide by *Brady*").

## CONCLUSION

For the reasons stated above, Defendants' request for a bill of particulars and to order discovery is DENIED, Defendants Pellot and Scott's motions for severance are DENIED, and Defendant Scott's motion to partially suppress, or alternatively for a *Franks* hearing, is DENIED.

The Clerk of Court is respectfully requested to close docket entries 67, 71, and 73.

**SO ORDERED.**

**Date: August 19, 2026**
**New York, NY**

Mary Kay Vyskocil

**MARY KAY VYSKOCIL**
**United States District Judge**